OPINION
 

 WERKER, District Judge.
 

 This is an action brought by petitioner, the Regional Director of the Second Region of the National Labor Relations Board for and on behalf of the National Labor Relations Board (the “Board”) seeking temporary injunctive relief pursuant to Section 10(j) of the National Labor Relations Act, as amended (the “Act”), 29 U.S.C. § 160(j), pending the final disposition of matters presently before the Board. Respondents in this action are the Major League Baseball Player Relations Committee, Inc., (“PRC”) and twenty-four of its constituent member clubs. A hearing on petitioner’s application was held on June 3 and 4, 1981. The Major League Baseball Players Association (the “Players Association”) was granted leave to participate at the hearing in support of petitioner. All parties were afforded full opportunity to be heard, to present evidence bearing on the issues and to argue on the evidence and the law. After duly considering all the evidence and arguments presented, the petition for injunctive relief is denied.
 

 FACTS
 

 Since 1966 the Major League baseball players have been represented by the Players Association. During this time the respondent PRC has been the exclusive collective bargaining agent of twenty-six Major League clubs.
 
 [1]
 
 The Board of Directors of the PRC is empowered to formulate labor relations policy for the clubs and direct all negotiations with the Players Association.
 
 [2]
 
 
 *590
 
 C. Raymond Grebey, Director of Player Relations of PRC, has been designated by the PRC Board as the official spokesman for the PRC in all collective bargaining matters. To assist the PRC Board of Directors in dealing with the Players Association, the Board has designated a bargaining team, which includes Mr. Grebey, to conduct all negotiations.
 
 [3]
 

 The Players Association and the PRC bargain to establish an agreement on pensions, allowances and a variety of rules governing players’ employment. Except as to a base salary, under the various agreements negotiated by the parties, the Players Association has waived its right to bargain with the PRC about individual player salaries. Thus, above a minimum salary, the subject has been left to each individual player to negotiate with his club.
 

 Prior to 1975, when a Major League baseball player’s employment contract expired, he was precluded from negotiating for employment with any other team except his own. In December 1975, as the result of grievances filed by the Players Association on behalf of John Messersmith and David McNally, an arbitrator found that Major League clubs could not reserve a player for more than one year (“option year”) past the expiration of his contract. A player who completes the option year without signing a renewal contract with his team becomes a “free agent” who is able to negotiate with other clubs.
 
 [4]
 

 In 1976 the Players Association and the PRC entered into a collective bargaining agreement, effective January 1, 1976 through December 31, 1979, which provided,
 
 inter alia,
 
 for “free agency” as established by the Messersmith-McNally decision. Pursuant to this agreement, however, a player was required to serve six years in the Major Leagues before becoming a “free agent.” The agreement also provided for “compensation”
 
 [5]
 
 in the form of an amateur player draft choice to each club which lost a “free agent” player selected by more than two clubs for negotiation rights. After four years of experimenting with this new system, the Players Association and the PRC commenced negotiations for a new collective bargaining agreement on November 11, 1979.
 

 On January 16, 1980, the PRC presented a proposal which recognized the difference in quality, as measured by skill and ability, among the various players choosing to become “free agents.” Under this proposal, as finally offered on May 12, 1980, a team losing a “free agent” selected by less than four clubs will not be afforded replacement player “compensation.” If a player is selected for negotiation rights by four to seven clubs, the club signing a contract with the player must compensate the player’s former club with an amateur draft choice, as before.
 
 [6]
 
 However, if a player is selected by eight or more clubs, and meets certain minimum performance standards,
 
 [7]
 
 the signing club must compensate the former club with not only an amateur draft choice, but also a professional player of the former club’s choice from a list of unprotected players under contract with the signing club. In this third category, the player is referred to as a “ranking free agent” or “premium” player. Each club may retain 40 players under the contract. Depending upon the performance level of the “free
 
 *591
 
 agent” signed, the signing team may protect from 15 to 18 of its 40 players.
 
 [8]
 

 The Players Association adamantly opposed this proposal as having a negative impact on player salaries. Since the proposal requires a club signing a “ranking free agent” to give up a professional player as well as an amateur draft choice, the Association predicts that the number of clubs willing to bid for a “premium” player and the salaries they would offer would be • limited by the knowledge that they would be required to forfeit a player of perhaps comparable quality. Correspondingly, the player’s present club could then offer him less to insure his remaining with the team.
 

 As negotiations progressed, various matters were being resolved, but it became apparent that the issue of additional replacement player “compensation” was a significant impediment to settlement. Unable to reach agreement on the PRC’s proposal, a strike deadline was established for May 23, 1980. On the eve of that deadline the PRC and the Players Association entered into a collective bargaining agreement (“basic agreement”), effective January 1, 1980 through December 31,1983, establishing the terms and conditions of employment of Major League baseball players. As part of that agreement, a joint study committee was appointed to consider the unresolved matter of replacement player “compensation” for a club which loses a “free agent.” The committee was to report to the PRC and the Players Association no later than January 1, 1981.
 

 On December 8,1980, Bowie Kuhn, Commissioner of Baseball, delivered a speech at the Annual Convention of Professional Baseball. Commenting on the financial difficulties facing the industry, Commissioner Kuhn expressed concern about escalating player salaries brought about by “free agency.” He cited the companion problem of “compensation” as a threat to competitive balance in baseball and thus expressed a concern about adequate replacement talent for the loss of a “free agent.” Sounding a clarion call to owners and players alike to recognize the need to correct the system of “free agency” which has given rise to these problems, he predicted further financial loss without cooperation between the two groups.
 

 Meanwhile, the joint study committee met on several occasions between August 7, 1980 and January 22, 1981. At one of the meetings, Marvin Miller, the Executive Director of the Players Association, referring to the press reports of Commissioner Kuhn’s statements at the Annual Baseball Convention on December 8, 1980, asserted that the clubs’ “compensation” proposal was motivated by financial concerns and by a desire to reduce player salaries. Mr. Grebey rebutted these statements and clearly stated that reduction of player salaries was not a goal of the clubs’ proposal and that no question of the clubs’ ability to pay was relevant or was being raised on behalf of the clubs.
 

 Failing to agree on a joint report, separate reports were issued by the PRC on February 17, 1981 and by the Players Association on February 19, 1981. The players’ position, as reflected in its report, is that the additional compensation for a “ranking free agent” diminishes that “free agent’s” bargaining position with the new team by the value of the player that the signing club expects to lose. The clubs repeated their position in the report submitted by its members, stating that its current approach is not designed to attack the subject of player salaries.
 

 This impasse ended round one of negotiations over the PRC’s proposal and set the stage for round two as provided for in Article XVIII, Section D(2) of the basic agreement:
 

 Negotiations.
 
 Subsequent to receiving the report of the study committee, the
 
 *592
 
 parties shall promptly meet to commence negotiations on the subject of the study. If the parties are unable to reach agreement on the matter of player selection rights as compensation to a Club which loses a free agent player after receiving the report of the study committee and by February 15, 1981, the Clubs may thereafter but before February 20,1981 unilaterally adopt and put into effect as part of the Basic Agreement the proposal on this matter . . . [see attachment 9] or a variation not less favorable to the Players Association. In the event the Clubs put such proposal into effect unilaterally, the Players Association may reopen the Basic Agreement with respect to the player selection rights provision put into effect by the Clubs and strike with respect thereto. The Player Association may reopen the Basic Agreement with respect to the player selection rights provision put into effect by the Clubs and strike with respect thereto. The Player Association shall give the Clubs notice of such reopening by March 1, 1981 and in such notice shall indicate the date on which it will strike, which date shall not be later than June 1, 1981. In the event the Players Association does not so strike, there shall be no further strike on this subject during the term of the Basic Agreement; provided, however, that the Players Association may, prior to March 1, 1981, offer to waive the right to strike described above and may request the Clubs to agree to a substitute right to strike in 1982 on a date not later than June 1, with no obligation on the part of the Clubs to accept such request.
 

 
 *585
 
 All of the above are instructions to personnel to assist them in the development and maintenance of informants. To release to the public the methods used by FBI personnel in the recruitment and handling of informants would place targets of FBI foreign counterintelligence investigations on notice as to these procedures and enable them to take counter measures to circumvent these practices.
 

 
 *592
 
 On February 19, 1981, the parties having failed to reach an agreement on the “compensation” issue, the clubs invoked their option under the basic agreement and unilaterally adopted as part of that agreement their last proposal on the issue. On February 26, 1981, the Players Association likewise exercised one of its options under the agreement, reopening the basic agreement on the unresolved issue and setting a strike deadline of May 29, 1981.® As a result of this reopener, the second round of negotiations began.
 

 By letter of February 27, 1981, the Players Association requested the PRC to provide certain financial information for all member clubs. The Players Association premised the appropriateness of its request on Commissioner Kuhn’s December 1980 speech which the Association interpreted as an affirmation of its belief that the “compensation” proposal was motivated by financial concerns.
 

 Mr. Miller explained that the requested financial data was “necessary for the Players Association to properly discharge its duties and responsibilities ... as the exclusive collective bargaining representative of all major league players, for purposes of preparation for and conduct of the ongoing negotiations.”
 

 On March 13,1981, the PRC, through Mr. Grebey, refused to comply with the Association’s request, repeating, the PRC’s position that its bargaining stance regarding “compensation” was not based on “economic incapacity or inability.” By letters of April 7 and 20,1981, the Players Association sought reconsideration of the PRC’s decision not to comply with its request. Specifically, the Association focused on the sharp increase in player salaries since the 1976 agreement.
 
 [9]
 

 [10]
 

 
 *593
 
 Noting a causal relationship between the “free agency” provisions of that agreement and the escalation of player salaries,
 
 [11]
 
 the Association challenged the PRC to deny that its proposal is “designed to negatively impact upon the salaries of free agent players.”
 

 Grebey responded by letter of April 24, 1981, and again refused to comply with the Association’s request. First, he noted the Association’s failure to seek disclosure of club financial data until it exercised its option to reopen the basic agreement, more than sixteen months after the commencement of negotiations on the issue of player “compensation.” Grebey further stated that the PRC had “never advanced the position nor taken refuge in argumentation which either directly or indirectly claims an inability to pay as a defense for [its] position in collective bargaining.” Rather, the objective of the PRC in proposing the plan for “compensation,” explained Mr. Grebey, “is to enhance player balance between clubs losing a quality free agent over the long term by providing replacement personnel that will: (1) compensate for the loss of a player; (2) compensate for the general inability of clubs to overcome this added turnover on a club roster through additions from the Minor Leagues; and (3) provide equity balance in compensation, reflecting the different levels of skill and ability of players who chose to become free agents as evidenced by our experience of the past four years.”
 

 Meanwhile, during this second round of negotiations, various statements by club owners appeared in the media. These statements all reflect an expression of concern about the financial well-being of the baseball industry and/or the level of player salaries. Specifically, in an article appearing in
 
 The Sporting News
 
 on March 21, 1981, Ruly Carpenter, President of the Philadelphia Phillies, stated that “salaries have basically gotten to ridiculous proportions.” Ray A. Kroc, Chairman of the Board of the San Diego Padres, made a statement which was quoted in
 
 The Sporting News
 
 magazine dated May 21, 1981, warning the players not to strike because there is a limit to the salaries they can be paid. He is also quoted as saying that only three or four clubs out of twelve in the National League are still making money.
 

 On March 21, 1981, Toronto Blue Jays President, Peter Bavasi, predicted in a radio interview that the rise in salaries as a result of “free agency” would force the clubs into bankruptcy if the situation were not corrected. He further commented that cooperation from the players regarding the “compensation” proposal would be helpful in restraining clubs from expending large sums on “free agents” since they would have to give up a promising player as a price for signing a “premium” player.
 

 On April 7, 1981, during a television interview, Ted Turner, President of the Atlanta Braves, similarly voiced concern about the financial state of the baseball industry due to salaries, as did Joseph Burke, in his capacity as Executive Vice President of the Kansas City Royals. Burke linked the rise in salaries to “free agency.”
 
 [12]
 

 Believing that the PRC’s bargaining position on the issue of player “compensation” was based at least in part on the financial difficulties of certain member clubs, on May 7, 1981, the Players Association filed an unfair labor practice charge with the Board alleging respondents’ failure to bargain in good faith by refusing to comply with the Players Association’s request for financial disclosure in violation of Sections 8(a)(1) and (5) of the Act, 29 U.S.C. §§ 158(a)(1) and (5).
 

 
 *594
 
 Following investigation and pursuant to Section 10(b) of the Act, 29 U.S.C. § 160(b), the Board filed a complaint charging respondents with violating Sections 8(a)(1) and (5) of the Act. A hearing on this complaint before an administrative law judge of the Board is scheduled to commence on June 15, 1981.
 

 The temporary injunctive relief sought by petitioner requires respondents to rescind their February 19, 1981, action by which they exercised their right under the 1980 basic agreement and unilaterally implemented their bargaining proposal regarding “compensation.” This relief, if granted, would thus preclude the Players Association, under the terms of the basic agreement, from commencing a strike. Petitioner argues that if its request for relief is not granted, the Players Association and the baseball player-employees it represents will be forced to strike within forty-eight hours after this Court rules, or be bound through the end of 1983 by the PRC’s proposal. Petitioner emphasizes that obvious irreparable harm to the players, owners and fans would flow from a decision by the Players Association to strike.
 

 The Association contends that if petitioner should prevail in the proceedings presently before the administrative law judge, the Board would be unable to adequately remedy the PRC’s alleged unfair labor practice by ordering the clubs to disclose the financial information which the Association seeks, since the Board cannot undo the effects of a "strike which would ensue as a result of the denial of petitioner’s instant request for relief.
 

 Respondents vigorously oppose petitioner’s application as a tactic by the Players Association to avoid the consequences of a contract freely bargained for and entered into by it.
 

 DISCUSSION
 

 To obtain a Section 10(j) injunction, petitioner must satisfy a two-fold test. First, this Court must find that there is reasonable cause to believe that an unfair labor practice has been committed. Second, the Court must determine whether the requested relief is just and proper.
 
 Kaynard v. Mego Corp.,
 
 633 F.2d 1026, 1030 (2d Cir. 1980);
 
 Kaynard v. Palby Lingerie, Inc.,
 
 625 F.2d 1047, 1051 (2d Cir. 1980),
 
 see Morio v. North American Soccer League,
 
 632 F.2d 217, 218 (2d Cir. 1980). Regarding issues of fact, petitioner “should be given the benefit of the doubt,” and with respect to questions of law, “the Board’s view should be sustained unless the court is convinced that it is wrong.”
 
 Kaynard v. Palby Lingerie, Inc.,
 
 625 F.2d at 1051;
 
 See Danielson v. International Organization of Masters,
 
 521 F.2d 747, 751 (2d Cir. 1975);
 
 Danielson v. Joint Board,
 
 494 F.2d 1230, 1245 (2d Cir. 1974).
 

 Unfair Labor Practice Claim
 

 Section 7 of the Act provides that “[ejmployees shall have the right to ... bargain collectively through representatives of their own choosing....” 29 U.S.C. § 157. Section 8(a)(5) of the Act implements this right by making it an unfair labor practice for an employer “to refuse to bargain collectively with the representatives of his employees. ...” 29 U.S.C. § 158(a)(5). Section 8(d) defines collective bargaining as,
 
 inter alia,
 
 “the mutual obligation of the employer and the representative of his employees to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment... . ” 29 U.S.C. § 158(d).
 

 Information concerning subjects at issue in bargaining is presumed to be necessary and relevant to negotiations, and employers and unions alike must provide such information when requested in the course of bargaining.
 
 N. L. R. B. v. General Electric Co.,
 
 418 F.2d 736, 753 (2d Cir. 1969),
 
 cert. denied,
 
 397 U.S. 965, 90 S.Ct. 965, 25 L.Ed.2d 257 (1970);
 
 N. L. R. B. v. Jacobs Manufacturing Co.,
 
 196 F.2d 680 (2d Cir. 1952).
 

 Since the Players Association exercised its option under the 1980 basic agreement on February 26, 1981, and reopened negotiations with regard to the PRC’s “compensa
 
 *595
 
 tion” proposal, collective bargaining has been limited to one issue: the level of “compensation” to be paid to a club when a former player of the club, upon the expiration of his employment contract becomes a “free agent” and contracts with another club for employment.
 

 The Board alleges in its petition that the public statements by club owners regarding claims of financial difficulties created a reasonable belief on the part of the Players Association that respondents’ bargaining position during this second round of negotiations was based, “at least in part, on the present or prospective financial difficulties of certain of Respondents’ member clubs.” Although Marvin Miller has expressed some doubt as to club owners’ inability to pay rising player salaries, he nevertheless takes the position that the Players Association must have the financial information it requests if it is to fulfill its duty of fair representation. If deprived of that information, the Association claims that it must blindly decide whether to press its demands and risk the loss of jobs for its members if the clubs cannot survive under the “compensation” terms proposed by the Association, or to recede from it position and accept the PRC’s proposal without verifying owners’ claims of financial distress caused by “free agency.” Thus, the Association brought an unfair labor practice charge against the PRC for its failure to disclose the requested financial data after the clubs allegedly put into issue their inability to pay-
 

 In
 
 N. L. R. B. v. Truitt Manufacturing Co.,
 
 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956), the Supreme Court laid to rest the question of whether an employer, bound by the National Labor Relations Act to bargain in good faith, could claim' that it was financially unable to pay higher wages and then refuse a union’s request to produce financial data to substantiate the claim. Holding that such conduct supported a finding of failure to bargain in good faith, in violation of Section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5), the Court explained:
 

 Good-faith bargaining necessarily requires that claims made by either bargainer should be honest claims. This is true about an asserted inability to pay an increase in wages. If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy.
 

 Id.
 
 at 152-53, 76 S.Ct. at 755-756.
 

 However,
 
 Truitt’s
 
 progeny have held that an employer is required to disclose its financial condition only when the employer claims an inability to pay, however phrased,
 
 during the course of bargaining. E. g. Western Massachusetts Electric Co. v. N. L. R. B.,
 
 573 F.2d 101 (1st Cir. 1978);
 
 Pressman v. N. L. R. B.,
 
 538 F.2d 496 (2d Cir. 1976).
 

 Petitioner admits that at no time during bargaining sessions have respondents made a claim of inability to pay. Nevertheless, petitioner urges the Court to find that public statements made by several club owners as well as the Commissioner of Baseball about the financial condition of the industry are sufficient to support a finding of reasonable cause to believe that respondents have injected the inability to pay into the negotiations.
 

 The cases cited by petitioner in support of its position are simply inapposite. In each case, inability to pay was put in issue at the bargaining table. Thus, no consideration of extrinsic events was necessary or relied upon in determining under
 
 Truitt,
 
 whether an employer raised the issue of inability to pay at the bargaining table.
 
 E. g., Latimer Bros.,
 
 242 N.L.R.B. 50 (1979);
 
 Teleprompter Corp.,
 
 227 N.L.R.B. 705 (1977),
 
 enf’d,
 
 570 F.2d 4 (1st Cir. 1977);
 
 C—B Buick, Inc.,
 
 206 N.L.R.B. 6 (1973),
 
 modified,
 
 506 F.2d 1086 (3d Cir. 1974);
 
 Goodyear Aerospace,
 
 204 N.L.R.B. 831 (1973),
 
 enf. denied on other grounds,
 
 497 F.2d 747 (6th Cir. 1974);
 
 Globe Gear Co.,
 
 189 N.L.R.B. 422 (1971),
 
 enf’d,
 
 451 F.2d 1348 (6th Cir. 1971).
 

 Thus, Petitioner concedes, as it must, that the Board and courts have never found that an employer has injected financial condition into negotiations, absent statements or con
 
 *596
 
 duct by the employer at the bargaining table. Nevertheless, it urges this Court to find, on the basis of statements by Commissioner Kuhn and various owners, that the financial issue has become relevant to the negotiations regarding “compensation” because of the unique nature of collective bargaining in baseball. Mindful that this Court must be “hospitable” to the views of the Regional Director, however novel,
 
 Danielson v. Joint Board,
 
 494 F.2d at 1244-45, I am nevertheless convinced that the Board’s position is wrong, and thus will not “defer to the statutory construction urged by [it].”
 
 Danielson v. International Organization of Masters,
 
 521 F.2d at 751.
 

 It is the PRC Board of Directors which is charged with the
 
 exclusive
 
 authority to formulate the collective bargaining position of the clubs and to negotiate agreements with the Players Association. Indeed, Grebey, the official spokesman for the PRC in collective bargaining matters, has consistently denied that the clubs’ financial status is at issue in the current negotiations.
 

 Commissioner Kuhn’s remarks in December 1980 at the convention cannot be imputed to the PRC as a statement of its bargaining position. First, petitioner’s attempt to establish an agency relationship between the Commissioner and the PRC is unavailing. As Commissioner of Baseball, Kuhn presides at the regular joint meetings of the Major Leagues, but does not request nor preside at special meetings called by the PRC. Moreover, while Kuhn is responsible for disciplining players who may then file grievances against him in his capacity as Commissioner, he has likewise ordered the clubs to cease certain action when the interests of baseball warranted his intercession, as when he directed the clubs to open their training camps in the spring of 1976.
 

 There can be little doubt that there is a correlation between “free agency” and the rise in player salaries. Commissioner Kuhn addressed this problem and expressed his concern about the high salaries negotiated between individual players and clubs. During his 1980 speech at the clubs’ convention, he also voiced concern for a companion problem, and called for cooperation between the players and owners in combating the threat to competitive balance. He expressed optimism that a solution would be found by the joint study committee that was then considering the “compensation” issue. Fairly read, I cannot find that the Commissioner’s speech supports the proposition that the clubs’ bargaining position on the replacement player “compensation” proposal is motivated by financial inability.
 

 Indeed, viewing the companion problem of player “compensation” as a separate issue, Commissioner Kuhn made a statement appearing in
 
 The Sporting News
 
 on January 24, 1981 that he did “not believe that ‘compensation’ as proposed by the clubs would have any effect on salaries or certainly not more than a marginal effect at most.”
 

 In a multi-employer bargaining unit as large and publicly visible as the Major League Baseball Clubs, it is inevitable that extraneous statements will be made by individuals affiliated in some way with the group which are inconsistent with the official position of the unit. This only underscores the necessity, recognized by the PRC, for centralized bargaining responsibility and authority. Clearly, individual expressions of opinion cannot serve to bind the entire bargaining unit in the absence of authority to speak for the group.
 
 See Anderson Pharmacy,
 
 187 N.L.R.B. 301, 302 n.10 (1970).
 

 Petitioner and the Association strain to emphasize the uniqueness of collective bargaining in the baseball industry to avoid the consequences of the established labor law regarding the inability to pay. However, this Court cannot accept “collective bargaining through the press” as a basis for a 10(j) injunction.
 

 The Act has provided for collective bargaining between the parties through their authorized representatives. If this Court were to find that the several public statements by club officials and the Commissioner were sufficient to support a finding that the PRC and its negotiating team view the respondents’ “compensation” proposal as re
 
 *597
 
 lated to the financial condition of the clubs, it would do violence to the intent and purpose of the Act which limits the jurisdiction of this Court.
 
 See McLeod v. General Electric Co.,
 
 366 F.2d 847, 849-50 (2d Cir. 1966),
 
 vacated as moot,
 
 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967).
 

 To accept petitioner’s argument would permit disgruntled employers in a multiemployer unit who disagreed with the negotiation policies of their representatives to force negotiation issues into the courts, thereby “conducting labor management relations by way of an injunction,”
 
 id.
 
 at 850, a result clearly contrary to the purpose of the Act. The Players Association and the PRC entered into a valid contract on May 23, 1980. As part of that contract they agreed that if the parties were unable to reach an agreement on the “compensation” issue, the PRC could implement its proposal, thereby triggering one of the Players Association’s options, that is, to reopen the agreement on that issue and set a strike deadline of no later than June 1,1981. This Court will not alter the terms of this contract for which the parties freely bargained by delaying implementation of the proposal and a possible strike on the basis of a tortured reading of the law regarding inability to pay.
 

 Thus, I cannot find that the comments by several club officials and the Commissioner, relied upon by petitioner, are statements of policy on behalf of the PRC which would support a claim of inability to pay.
 

 Moreover, the issue of salary, above a minimum rate, is not a subject of collective bargaining between the Players Association and the PRC. Rather, individual players negotiate independently with the clubs as to their salary. Indeed, it is the high player salaries which have resulted from the negotiation of individual contracts by players and clubs which Commissioner Kuhn addressed in his 1980 speech. Noting that player salaries are increasing at a more rapid rate than revenues, he opined that bargaining of individual contracts has led to this problem. He called upon players and owners to cooperate in this regard to arrest the trend and avoid loss to all, including the fans who will be required to pay higher ticket prices.
 

 The evidence adduced at the hearing is insufficient to support a finding that the replacement player “compensation” proposal implemented by the PRC presents economic issues. Rather, the proposal is addressed to the inequities which flowed from the “compensation” for “free agents” as provided for in the 1976 agreement. Specifically, the proposal implemented by the PRC in February 1981, recognized the difference in skill and ability among “free agents” by the type of compensation provided to a club losing the player. In addition, the proposal is designed to more adequately assist the clubs in replacing players lost in the “free agent” draft. Under the 1976 agreement, clubs were unable to replace lost players through the Minor League and amateur systems within a meaningful time period, if at all.
 

 Finally, I find an insufficient basis for the Board’s assertion that the Players Association has a reasonable and rational belief in the clubs’ inability to pay in view of its delay in requesting financial data for more than one year after the “compensation” proposal was first introduced by respondents.
 

 As early as 1975 there were reports about club financial losses. In response to these reports, Miller characterized the claims as “phony.” In 1977, again in response to reports of financial loss, Miller stated that the clubs had been making that claim for years. In January 1979, Miller claimed that the concern about the escalation of salaries was ill-founded since Major League clubs pay players a smaller proportion of income than most other industries. Tr. 56-60. A few days following the Commissioner’s speech in December 1980, Miller likewise commented on the credibility of statements regarding alleged club losses by focusing on the rise in capital gains over the preceding five years. Tr. 63. Indeed, as recently as March or April of this year, Miller predicted that the clubs would refuse to produce the requested financial data because they were not losing money. Tr. 64.
 

 
 *598
 
 Despite the presentation of a “compensation” proposal in January 1980 and Miller’s apparent knowledge for several years of the losses claimed by club owners, the Players Association first requested financial information from the clubs on February 27,1981. This delayed request coupled with Miller’s expressed opinion that the clubs were not losing money leads to the inescapable conclusion that the proceedings brought before the Board, resulting in the instant action, was not a sincere effort to obtain access to the clubs’ financial records, but rather a bargaining tactic by the Association to prevent the implementation of the PRC’s proposal.
 

 The court is mindful that a strike may result from its denial of petitioner’s request for a 10(j) injunction. Indeed, the industry has suffered a strike in the past. Nevertheless, in struggling with a temptation and even compulsion to prevent a strike in the public interest, I am bound by the law. The possibility of a strike, although a fact of life in labor relations, offers no occasion for this Court to distort the principles of law and equity. The resolution of the “compensation” issue is left to the parties through the negotiation process.
 

 CONCLUSION
 

 In accordance with the foregoing, I find there is no reasonable cause to believe that an unfair labor practice has been committed by respondents. The petition is therefore dismissed.
 

 PLAY BALL!!!
 

 SO ORDERED.
 

 [1]
 

 . The PRC is a multi-employer bargaining unit composed of the twenty-four respondent American Major League baseball clubs as well as two Canadian-based clubs, the Montreal Baseball Club, Ltd. and the Toronto Blue Jays Baseball Club. Petitioner is not seeking injunctive relief against the two Canadian clubs.
 

 [2]
 

 . The Members of the PRC Board of Directors are: Charles Feeney, (President of the National League), Leland MacPhail (President of the American League), Joseph Burke (Executive Vice-President and General Manager of Kansas City Royals), Edmund Fitzgerald (Chairman of Milwaukee Brewers), Daniel Galbreath (President of Pittsburgh Pirates), Clark Griffith (Executive Vice President of Minnesota Twins), Robert Howsam (Executive Vice Chairman of Cincinnati Reds) and John McHale (President and Chief Executive Officer of Montreal Expos).
 

 [3]
 

 . The PRC bargaining team consists of Mr. C. Raymond Grebey, and the two League Presidents, Mr. Charles Feeney and Mr. Leland MacPhail.
 

 [4]
 

 .
 
 Professional Baseball Clubs,
 
 66 Labor Arbitration Reports 101 (1975). This new concept in baseball was affirmed by the courts in
 
 Kansas City Royals v. Major League Baseball Players Association,
 
 409 F.Supp. 233 (W.D.Mo.),
 
 aff'd,
 
 532 F.2d 615 (8th Cir. 1976).
 

 [5]
 

 . One wonders what William Satire might do with the language concept that “compensation” in athletic terms means the exchange of bodies.
 

 [6]
 

 . An amateur draft choice is a high school or college player.
 

 [7]
 

 . This “free agent” player must rank in the upper ‘A or of certain performance categories, and be drafted within a specified number of rounds.
 

 [8]
 

 . In addition to the proposal for replacement player “compensation,” the clubs also sought to require the Players Association to bargain directly about players’ salaries by establishing salary ranges for players with less than six years of Major League service. Changes were also sought in the procedure by which the salaries of some players may be established by arbitration. During the negotiations, the clubs withdrew both these proposals.
 

 [9]
 

 . The strike deadline was subsequently extended by stipulation of the parties on May 28, 1981, the date petitioner instituted this action. Pursuant to that stipulation the parties agreed that the Players Association’s right to strike is extended to 48 hours following this Court’s ruling on the petition presently before it. The parties also agreed that the Players Association will not commence a strike until at least 24 hours after the Court’s ruling.
 

 [10]
 

 . Commenting on public resentment of high salaries in sports, an article appearing in
 
 Sports Illustrated,
 
 June 1, 1981, contained the following quote at 90:
 

 “There was a time when the League stood for integrity and fair dealing. Today it stands for dollars and cents. Once it looked to the elevation of the game and an honest exhibition of the sport; today its eyes are on the turnstile. Men have come into the business for no other motive than to exploit it for every dollar in sight.”
 

 
 *593
 
 That statement is from a “manifesto” issued in 1889 by the Brotherhood of Ball Players. The issuance of the “manifesto” was a prelude to the formation of a players’ league. Dissatisfied, among other things, with the imposition of salary limits set by the owners, the Players League was formed for the 1890 season as an alternative to striking.
 

 [11]
 

 . The average Major League Baseball player’s salary has risen from approximately $52,300 per year in 1976 to $196,500 in 1981.
 

 [12]
 

 . Although Joseph Burke is also a member of the Board of Directors of the PRC, his remarks quoted in the
 
 Kansas City Star
 
 were not made in that capacity.