Samuel M. KAYNARD, Regional Director of the Twenty-ninth Region of the National Labor Relations Board, For and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner-Appellee,

v.

PALBY LINGERIE, INC., Elmont Underwear Corp., Argus Lingerie Corp., and Richwear Sportswear, Inc., Respondents-Appellants.

No. 975, Docket 80–6018.

United States Court of Appeals,
Second Circuit.

Argued March 7, 1980.

Decided July 7, 1980.

National Labor Relations Act, as amended, 29 U.S.C. § 160(j) (1970), pending the National Labor Relations Board's disposition of charges of unfair labor practices. The Regional Director of the Board's Region 29 sought the injunction against four small corporations, all owned and operated by one or more members of the Isaac Israel family. The injunction was issued by the United States District Court for the Eastern District of New York (Mark A. Costantino, Judge). The four companies ("the employer") appeal, challenging the injunction insofar as it requires the reinstatement of two employees and obliges the employer to recognize and bargain with Local 57, Nassau-Suffolk District Council, International Ladies Garment Workers Union, AFL-CIO.[1] We affirm.

### Background

The four companies are engaged in the manufacture, sale, and distribution of women's lingerie. Palby Lingerie, Inc. ("Palby"), the sales arm of the operation, is responsible for purchasing the materials used in the manufacturing process as well as packing and shipping the finished garments to Palby's customers. The other three companies—Richwear Sportswear, Inc. ("Richwear"), Elmont Underwear Corp. ("Elmont") and Argus Lingerie Corp. ("Argus")—function as the production arms of the business and perform services exclusively for Palby. Richwear does all of Palby's cutting and trimming work, while Elmont and Argus do the sewing and finishing work. The business offices of Palby and the production facilities of Elmont and Richwear are all located in the same building in Elmont, New York. The Argus plant is located about 20 miles away in Brooklyn, New York.

Richard M. Naness, Hewlett, N. Y. (Milman, Naness & Pollack, Hewlett, N. Y., on brief), for respondents-appellants.

Joseph P. Norelli, Supervising Atty., N.L.R.B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Harold J. Datz, Associate Gen. Counsel, Joseph E. Mayer, Asst. Gen. Counsel, Washington, D. C., on brief), for petitioner-appellee.

Before NEWMAN and KEARSE, Circuit Judges, and SIFTON,* District Judge.

NEWMAN, Circuit Judge.

This is an appeal from a temporary injunction issued pursuant to § 10(j) of the

---

* Of the United District Court for the Eastern District of New York, sitting by designation.

1. The District Court's order also enjoins the employer from engaging in certain specified activities such as interrogating employees concerning their union involvement; threatening employees with the closing of the plants or other reprisals for joining or assisting Local 57; giving the impression of surveillance of Local 57's activities; and discharging or laying off employees, or assigning them to less agreeable job tasks and subjecting them to closer supervision and increased criticism, because of their support for Local 57 or their involvement in other activities for "mutual aid or protection." The employer has raised no objection on appeal to these portions of the order.

Local 57 began its organizing efforts in late January, 1979. By February 21, 1979, the union, having obtained 27 signed authorization cards, demanded recognition as the bargaining representative of the 50 production, maintenance, shipping, and receiving employees at the employer's two locations. These cards were signed by 19 of the 30 production, maintenance, shipping, and receiving employees employed by Elmont, 7 of the 14 employed by Argus, and 1 of the 6 employed at Richwear.[2] No cards were obtained from Palby personnel, all of whom are supervisors.

The Regional Director, responding to charges filed by Local 57, issued his first complaint against the employer on April 30, 1979. The complaint alleged as a preliminary matter that the group of employees that Local 57 had sought to represent constituted an appropriate bargaining unit under the NLRA:

> All production, maintenance, shipping and receiving employees of the Respondent employed at its Elmont factory and its Brooklyn factory combined, exclusive of all other employes, guards and supervisors as defined by Section 2(11) of the Act, constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act.

It also alleged that Local 57 was the exclusive bargaining representative of employees in the unit by virtue of its designation as of February 21, 1979 by a majority of employees, and that the employer had violated § 8(a)(5) by refusing to bargain with Local 57. The complaint also alleged that the employer, by engaging in various enumerated acts constituting "unfair labor practices serious and substantial in character and effect," had "prevented the holding of a fair election among its employees, thereby requiring the issuance of a bargaining order as an appropriate remedy."

In addition, the employer was alleged to have violated §§ 8(a)(1) and 8(a)(3) by laying off two employees, Sharon Hunter and Maria Ferrante, in February, 1979 and refusing to recall them until late April, 1979; discharging a third employee, Rosetta Lyons, and refusing to reinstate her; and assigning its employees at the Elmont factory to "less agreeable job tasks" and subjecting them to "closer supervision and increased criticism," all because of their union activity. Finally, the employer's agents were alleged to have violated § 8(a)(1) by interrogating employees in both plants concerning their union involvement; giving employees at the Elmont factory the impression that their union activities were under surveillance; and threatening employees with the closing of the plants and other reprisals if they supported Local 57.

The Regional Director's § 10(j) petition asserted the existence of "reasonable cause to believe" the allegations of the complaint were true and that unless the employer's "flagrant unfair labor practices are immediately enjoined, . . . enforcement of important provisions of the Act and of public policy will be thwarted before the [employer] can be placed under legal restraint through the regular procedure of a Board order and enforcement decree." As relief, the petition sought an order enjoining repetition by the employer of the acts alleged to violate the Act and compelling the employer to recognize and bargain with Local 57 and offer reinstatement to Rosetta Lyons. The § 10(j) petition was later amended to allege that the employer had also violated §§ 8(a)(1) and 8(a)(3) by constructively discharging Sharon Hunter on May 1, 1979, about a week after her recall. Hunter's reinstatement was sought in the revised prayer for relief.

Judge Costantino postponed consideration of the petition pending completion of the Board's administrative hearing on the complaint. The parties later stipulated that the transcript of testimony and the exhibits introduced in the administrative hearing would constitute the record in the § 10(j)

---

2. The company-by-company breakdown of those employees who signed authorization cards is based on a comparison of the names of those who signed cards with a list stipulated to by the employer of its production, maintenance, shipping, and receiving employees as of the week ending February 23, 1979.

proceeding. On January 18, 1980, Judge Costantino granted the Regional Director's petition for a temporary injunction and remedial bargaining order pending the Board's final disposition of the case. In its oral opinion granting the petition, the District Court explicitly found "reasonable cause to believe that unfair labor practices have occurred" and observed that:

> The threats, both express and implied, alone are sufficient to demonstrate the existence of labor violations. Indeed, the record is replete with instances of attempts to hinder, if not completely defeat, the efforts of the Union to organize. The questioning of employees, the threat to terminate the employment of Union organizers, sympathizers or joiners, and the open hostility of the owners toward the Union, lead the Court to believe that there is reasonable cause for issuing the temporary injunction.

In addition, Judge Costantino found a "sufficient basis in the record" to support a finding of an appropriate bargaining unit. This finding was based on subsidiary findings that Local 57 had successfully obtained authorization cards from a majority of the employees in "the corporate structure as a whole, and from the larger units individually" and that but for the possible violations of the labor laws, Local 57 "would have amassed a much greater proportion of employees."

Following the timely filing of the employer's notice of appeal, Judge Costantino denied a motion by the employer for a stay pending appeal. This Court denied a similar motion on February 5, 1980.

## Discussion

 The two principal issues before a district court in a proceeding under § 10(j)[3]

are whether there is reasonable cause to believe that unfair labor practices have been committed and, if so, whether the requested relief is "just and proper." See *Solien v. Merchants Home Delivery Service, Inc.*, 557 F.2d 622, 626 (8th Cir. 1977); *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 36–37 (2d Cir. 1975). With respect to issues of fact, the Regional Director "should be given the benefit of the doubt," *Seeler, supra*, 517 F.2d at 37, and on questions of law, the Board's view should be sustained unless the court is convinced that it is wrong, see *Danielson v. International Organization of Masters*, 521 F.2d 747, 751 (2d Cir. 1975); *Humphrey v. International Longshoremen's Association*, 548 F.2d 494, 497 (4th Cir. 1977). The issues on this appeal are whether the District Court's reasonable cause determination was correct and whether the Court abused its discretion in fashioning equitable relief. See *Danielson v. Joint Board of Coat, Suit & Allied Garment Workers' Union*, 494 F.2d 1230, 1244 & n.22 (2d Cir. 1974). We will consider separately the reinstatement requirement and the bargaining order.[4]

A. Reinstatement of Rosetta Lyons and Sharon Hunter.

 The administrative record fully supports a finding of reasonable cause to believe that the March 27, 1979 discharge of Rosetta Lyons violated § 8(a)(1) of the Act. Several employees testified that Lyons was discharged when she failed to heed the instructions of agents of the employer to cease distributing union literature on company premises during the lunch break. If this testimony is credited,[5] Lyons' discharge

---

**3.** Section 10(j) provides:

> The Board shall have power, upon issuance of a complaint . . . charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred . . ., for appropriate temporary relief or restraining order. Upon the filing of any such petition the court . . . shall have jurisdiction to

grant to the Board such temporary relief or restraining order as it deems just and proper.

**4.** We have considered and rejected as insubstantial the employer's claim that the Board unduly delayed in seeking § 10(j) relief.

**5.** According to the testimony of the employee witnesses, Lyons was told she was "fired" when she continued to distribute union literature on company premises during the lunch break despite warnings from Richard and Pau-

almost certainly constituted an unfair labor practice, see *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803 n.10, 65 S.Ct. 982, 928 n.10, 89 L.Ed. 1372 (1945), since the company has articulated no "special circumstances" adequate to overcome the presumption against restrictions on employee distributions.[6] See *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 492–93, 98 S.Ct. 2463, 2469–2470, 57 L.Ed.2d 370 (1978); *Times Publishing Co. v. NLRB*, 576 F.2d 1107, 1109 n.2 (5th Cir. 1978); *NLRB v. Orleans Mfg. Co.*, 412 F.2d 94, 96 (2d Cir. 1969).

The record also supports reasonable cause to believe Lyons' discharge violated § 8(a)(1) on the alternative theory that the employer enforced its no-distribution policy in a discriminatory manner. See *Head Division, AMF, Inc. v. NLRB*, 593 F.2d 972, 977–78 (10th Cir. 1979); *Midwest Regional Joint Board v. NLRB*, 564 F.2d 434, 446 (D.C.Cir. 1977); *Schwarzenbach-Huber Co. v. NLRB*, 408 F.2d 236, 256 (2d Cir.), *cert. denied.*, 396 U.S. 960, 90 S.Ct. 436, 24 L.Ed.2d 425 (1969). Prior to the beginning of Local 57's organizing efforts, the employer apparently permitted such activities as the sale of candy by employees during the lunch period. Such a pattern of past acquiescence supports an inference that the employer's application of a no-distribution rule to Lyons and other union organizers was designed to interfere with union organizational activities rather than simply to serve plant efficiency. See *NLRB v. Montgomery Ward & Co.*, 554 F.2d 996, 1000 (10th Cir. 1977); *NLRB v. Daylin, Inc.*, 496 F.2d 484, 488 (6th Cir. 1974); *Schwarzenbach-Huber Co. v. NLRB, supra*, 408 F.2d at 256.

■ The May 1, 1979 discharge of Sharon Hunter presents a closer question. According to the undisputed evidence, Hunter worked for Richwear for a short period in early February, 1979 and was not recalled until April, 1979, about a month after Local 57 filed a charge alleging that the employer, by laying her off for union activity, had violated § 8(a)(3) of the Act. When Hunter resumed work on April 23, 1979, she was initially assigned to work on the same spooling machine she had operated in February. The next day she was assigned the additional task of placing panties on hangers. Thereafter Hunter and members of the Israel family frequently clashed over whether she was required to stand while doing her work. Finally, on May 1, 1979, the day Hunter's employment with Richwear ended, Isaac Israel approached Hunter and told her, "If you don't like the work, why stay here. I'm not going to fire you." According to Hunter, he repeated the first sentence several times, at which point she announced: "Yes, you have just fired me," gathered her belongings, punched out, and left the premises.

---

line Israel not to continue doing so. The employer, however, contends that Lyons "constructively quit" her job. This view is supported by Pauline Israel's testimony that she had warned Lyons that she (Lyons) would be fired if she continued to distribute the materials *after* the lunch break ended and work resumed ("on my time"), and that it was Lyons who *then announced of her own accord that she had* been fired and proceeded to walk out. Richard Israel also denied having fired Lyons. He testified that he had done no more than warn Lyons that she would be fired *if* she continued yelling at his mother, Pauline. Of course, it remains for the Board to determine which description of events is most credible. We decide only that the record, for purposes of this § 10(j) proceeding, provides adequate support for the Regional Director's allegation that Lyons was unlawfully discharged.

**6.** The Board's presumption against restrictions on employee distributions is limited to distributions during non-working time *in non-working areas Stoddard-Quirk Mfg. Co.*, 138 N.L.R.B. 615 (1962); *see Beth Israel Hospital v. NLRB*, 437 U.S. 483, 493 n.10, 98 S.Ct. 2463, 2469 n.10, 57 L.Ed.2d 370 (1978). In this case, Lyons was distributing materials in the production area of the plant. We cannot conclude, however, that this circumstance renders the Board's presumption inapplicable. Where, as here, a production area is regularly used by employees as a lunch area with the "full knowledge and approval" of the employer, the Board's position is that the area ceases, for the duration of the lunch period, to be a "work area" where distribution can be prohibited. *Oak Apparel, Inc.*, 218 N.L.R.B. 701 (1975); *Rockingham Sleepwear, Inc.*, 188 N.L.R.B. 698, 701 (1971). For purposes of this § 10(j) proceeding, we need go no further than to conclude that this position appears to be an entirely reasonable one.

The sequence of events is ambiguous as to whether there was any discharge at all and, if so, whether the discharge was for permissible reasons. The employer contends that Hunter's own testimony establishes that she quit her job and that, in any event, she conducted herself in a manner that would have been cause for discharge. While various inferences were available to the fact-finder, we cannot conclude that Judge Costantino erred in finding reasonable cause to believe that Hunter was discharged in violation of the Act.

■ The effect, not the particular form, of the language used by the employer determines whether an employee has been discharged. See *NLRB v. Hale Manufacturing Co.*, 570 F.2d 705, 708 (8th Cir. 1978); *Filler Products, Inc. v. NLRB*, 376 F.2d 369, 378 (4th Cir. 1967). In this case, Isaac Israel's final words to Hunter can fairly be viewed as conveying to Hunter the message that her continued presence at the plant was no longer welcome and, despite the simultaneous disclaimer that "I'm not going to fire you," as conveying the further message that her employ at Richwear was at an end. Significantly, when Hunter replied, "Yes, you have just fired me," Isaac did nothing to disabuse her of that impression, perhaps because it was not a mistaken one.

■ Hunter's testimony suggests that at the time of her final conversation with Isaac Israel on May 1, 1979, she believed that she had been subjected by her employers to a pattern of harassment and discriminatory assignments. This belief, reasonably supported by the record, not only provides further grounds for viewing Isaac Israel's statement to Hunter as a discharge, but also supports an independent finding that Hunter was "constructively discharged" by the employer's actions, rather than by his words. What must be shown is that the employer, in retaliation for union activities, induced the employee to quit her job through alteration of the employee's working conditions or other forms of harassment. *Cartwright Hardware Co. v. NLRB*, 600 F.2d 268, 270 (10th Cir. 1979); *J.P. Stevens & Co., Inc. v. NLRB*, 461 F.2d 490, 494 (4th Cir. 1972); *NLRB v. Holly Bra of California, Inc.*, 405 F.2d 870, 872 (9th Cir. 1969). There is at least reasonable cause to believe that Hunter's union activity, and not the quality of her work, motivated her assignment of duties and the insistence that she stand while working.

■ As interim relief, Judge Costantino ordered the employer to offer reinstatement to Hunter and Lyons. The record shows that both employees, particularly Lyons, were active and open union supporters. Their discharges therefore risked a serious adverse impact on employee interest in unionization. In such circumstances, the District Court's order that they be reinstated clearly was just and proper. See *Angle v. Sacks*, 382 F.2d 655, 661 (10th Cir. 1967); *Taylor v. Circo Resorts, Inc.*, 458 F.Supp. 152, 155 (D.Nev.1978); *Seeler v. Williams*, 97 LRRM 2764, 2768–69 (N.D.N.Y.1977); *Smith v. Old Angus Inc.*, 82 LRRM 2930, 2937, *stay denied*, 83 LRRM 2413 (D.Md. 1973).

## B. Bargaining Order

■ The witnesses called by the Regional Director during the course of the administrative hearing testified to a wide range of anti-union activities engaged in by agents of the employer. These included, in addition to the discharges of Sharon Hunter and Rosetta Lyons, interrogation of at least eight employees concerning their union affiliation,[7] threatening plant closure and other reprisals in the event Local 57 became

---

7. The record contains testimony that five Elmont employees (Teresa Proce, Margarita Andriano, Teresa Liberti, Lydia Pagon, and Elisa Brighandi) were individually asked by Pauline Israel, supervisor of the Elmont operation, if they had signed union cards. There was also testimony that on separate occasions Mary Peri, the supervisor of Argus, and Isaac Israel questioned two Argus employees (Adamina Perez and Miguel Gonzales) about whether they had signed union cards. Finally, the record indicates that Isaac Israel questioned at least one Richwear employee (Sharon Hunter) about whether she belonged to a union.

the bargaining representative,[8] creating the impression of surveillance of union members,[9] and imposing disfavored duties on union supporters.[10] Judge Costantino credited this testimony for purposes of the § 10(j) proceeding, and concluded that reasonable cause existed to believe unfair labor practices had occurred. The record fully supports the District Court's reasonable cause determination. Indeed, if the disputed issues of fact ultimately are resolved in favor of the Regional Director, the employer's conduct represents, in the words of the Regional Director, "a textbook case of unlawful interference with employees' organizational rights."

▮▮▮▮ Nevertheless, the employer vigorously disputes the granting of an interim bargaining order, especially in a case like this where no final determination has yet been made as to the appropriate bargaining unit. In this Circuit, § 10(j) interim relief may include a bargaining order even though the union, like Local 57, has never had a prior bargaining relationship with the employer. *Seeler v. Trading Port, Inc., supra*, 517 F.2d at 38–39; accord, *Levine v. C & W Mining Co.*, 610 F.2d 432, 436–37 (6th Cir. 1979); *Hirsch v. Trim Lean Meat Products, Inc.*, 479 F.Supp. 1351, 1361–64 (D.Del. 1979); *Henderson v. Gibbons & Reed Co.*, 53 CCH Lab. Cas. ¶ 11,081 (D.N.M.1966); contra, *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193–94 (5th Cir. 1975) *cert. denied*, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976); see *Fuchs v. Steel-Fab, Inc.*, 356 F.Supp. 385, 387 (D.Mass.1973). Such relief may be given "when the Regional Director makes a showing, based on authorization cards, that the union at one point had a clear majority and that the employer then engaged in such egregious and coercive unfair labor practices as to make a fair election virtually impossible . . . ." *Seeler, supra* at 40. Judge Costantino made both of the findings required by *Seeler*, and the record supports these findings.

▮▮▮▮ The employer seeks to distinguish *Seeler* on the ground that in that case there had been a final unit determination, which was a prerequisite to the representation election, whereas no final unit determination has yet been made in this case. As the employer points out, the Board may ultimately disagree with the Regional Director as to the appropriate unit, and, if an agreement is concluded in the interim, the employer will be contractually bound to a union that does not lawfully represent all of the employees. If the employer's two plants are ultimately considered to be separate units, Local 57 would have a card majority at the Elmont plant, but not at the Brooklyn plant, where only 7 of the 14 Argus employees signed cards. While any agreement can contain a condition subsequent to take into account the possibility of the Board's rejecting the Regional Director's unit determination, we recognize that such an eventuality could create a somewhat anomalous situation for future bargaining and would mean that some employees have, during the interim, been represented contrary to a proper choice of bargaining representative.

However, we do not believe the absence of a final unit determination should neces-

---

8. On February 12, 1979, Pauline Israel told the Elmont employees during their lunch break that she did not want and would not allow Local 57 to come in. Though the recollections of the employees were not entirely consistent, several testified that Pauline also told them that the union would put the company out of business and result in closure of the plant. On a separate occasion, the Elmont employees were told by Isaac Israel that the union would put him out of business and he would close the shop. Argus employees were similarly told that the factory would be closed if the union came in.

9. One witness testified that Pauline Israel had expressed curiosity on several occasions about who had brought the union in and who was acting as the union informant.

10. Rosetta Lyons testified that during her first two months of work at Elmont, she performed as many as six different tasks, including separating work, folding, sorting, bagging, ticketing, and packing. However, in mid-February, shortly after her employers learned she was a union supporter, she was assigned to hang panties, a job that consumed about 80% of her time until her discharge on March 27, 1979.

sarily preclude an interim bargaining order. As the Sixth Circuit has recognized, a requirement of prior Board certification would preclude an interim bargaining order whenever recognition was sought on the basis of authorization cards. *Levine v. C & W Mining Co., supra.* Admittedly, the Sixth Circuit's opinion in *Levine* did not discuss any dispute as to the appropriate bargaining unit, although the matter had been, in dispute in the district court. *Levine v. C & W Mining Co.,* 465 F.Supp. 690, 694 (N.D.Ohio 1979). Two other district courts have considered interim bargaining orders inappropriate for lack of a final Board determination of the unit. *Taylor v. Circo Resorts, Inc., supra,* 458 F.Supp. at 157; *Dick v. Sinclair Glass Co.,* 283 F.Supp. 505, 511–12 (N.D.Ind.1967). Of course a district court is always entitled to deny an interim bargaining order if pursuaded that the dispute as to the bargaining unit is substantial. *Cf. Kaynard v. Steel Fabricators Ass'n,* 95 LRRM 2015 (E.D.N.Y.1976), where § 10(j) relief was denied in the face of competing representational claims by rival unions. But where there is a substantial basis for the Regional Director's unit determination, a district court acts well within its discretion to include a bargaining order in a § 10(j) injunction. The unit determination, like the finding of the unfair labor practices, might ultimately be set aside by the Board. That possibility simply highlights the fact that there are risks to the carrying out of sound labor law policy whether an interim bargaining order is granted or denied. If granted, later Board reversal of the findings on which it was based might upset orderly collective bargaining. If denied, later Board approval of those findings will come at a time when those violating the Act might have been able to "accomplish their unlawful objective before being placed under any legal restraint." S.Rep.No. 105, 80th Cong., 1st Sess. 27 (1947), commenting on the provision that became § 10(j).

11. The employer contends that the unit requested by the Regional Director is inappropriate only to the extent it includes employees in both the Brooklyn and Elmont plants, but has

In this case, the record shows that the operations of the four Israel family corporations were functionally integrated and that the companies were subject to a substantial degree of common control. In addition, there were substantial similarities in the working conditions and personnel policies at the two plants. The District Court was fully entitled to find that there was a substantial basis for the multi-plant unit alleged by the Regional Director,[11] see *Caron International, Inc.,* 222 N.L.R.B. 508 (1976); *U-Wanna-Wash Frocks, Inc.,* 203 N.L.R.B. 174 (1973); *National Connector, Div. of Fabri-Tek Inc.,* 191 N.L.R.B. 675 (1971), and, under the circumstances of this case, to issue a bargaining order.

Affirmed.

raised no objection to the appropriateness of including production, maintenance, shipping, and receiving employees in the same unit.