880 F.Supp. 246 (1995)
Daniel SILVERMAN, Regional Director for Region 2 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,
v.
MAJOR LEAGUE BASEBALL PLAYER RELATIONS COMMITTEE, INC. and the Constituent Member Clubs of Major League Baseball, Respondents.
No. 95 Civ. 2054(SS).
United States District Court, S.D. New York.
April 3, 1995.
*247 *248 *249 The National Labor Relations Bd. Region Two, New York City, Fred L. Feinstein, General Counsel, Daniel Silverman, Regional Director, Donald B. Zavelo, Ian M. Penny, of counsel, for petitioner.
Morgan, Lewis & Bockius, Washington, DC, Francis L. Casey, III, Lisa Klein Wager, New York City, of counsel, for respondent.
Charles O'Connor, General Counsel, Major League Baseball Player Relations Committee, New York City, Bredhoff & Kaiser, Washington, DC, George H. Cohen, Virginia A. Seitz, of counsel, McGuire, Kehl & Nealon, LLP, New York City, Harold F. McGuire, Jr., of counsel, for Major League Baseball Players Ass'n.

*250 AMENDED OPINION AND ORDER[1]
SOTOMAYOR, District Judge.
This is an action brought by Petitioner, Daniel Silverman, the Regional Director for Region 2 of the National Labor Relations Board (the "Board" or "NLRB"), seeking a preliminary injunction under Section 10(j) of the National Labor Relations Act (the "Act" or "NLRA"), as amended 29 U.S.C. §§ 151-169 (1988), pending the final disposition of charges presently before the Board. Respondents in this action are the Major League Baseball Player Relations Committee, Inc. (the "PRC"), the collective bargaining representative for the twenty-eight (28) Major League Clubs (collectively the "Owners").
The Major League Baseball Players Association (the "Players") is the collective bargaining unit for the forty-person rosters of each of the Major League Clubs. On March 15, 1995, on the basis of charges filed by the Players, the Board issued a Complaint and Notice of Hearing alleging, inter alia, that the Owners had violated Sections 8(a)(1) and (5) of the Act by unilaterally eliminating, before an impasse had been reached, salary arbitration for certain reserve players, competitive bargaining for certain free agents, and the anti-collusion provision of their collective bargaining agreement, Article XX(F). After the Board concluded that there was reasonable cause to believe that a violation of the Act had occurred and that injunctive relief was just and proper, it filed this Petition on March 27, 1995. The Board, the Owners, and the Players, who were permitted to participate in this action, thereafter filed papers in support of their respective arguments.
During a telephone conference with me on March 30, 1995, all parties agreed that the only issues before the Court were questions of law and that no witnesses would be necessary at the hearing to be held on March 31, 1995. Having reviewed all of the submissions of the parties and having given them a full opportunity to be heard, I have concluded that the Board has reasonable cause to believe that the Owners have committed an unfair labor practice, and that an injunction is just and proper to avoid irreparable injury and to ensure that the Owners and Players continue bargaining, in good faith, until the resolution of their disputes, or a genuine impasse untainted by the unfair labor practices, or the determination by the NLRB of the charges before it, whichever occurs earliest.

FACTS
I recognize that baseball purists will wince at my simplified explanation of the very complex relationship between the Owners and Players which has evolved since 1966 in their collectively bargained Basic Agreements. Similarly, others will be disappointed by my cursory description of the prolonged negotiations between the parties. The purpose of my recitation here, however, is only to highlight the facts giving rise to the central issues before me.
The most recent Basic Agreement between the parties extended from January 1990 through December 1993. The Agreement covered a multitude of employment terms and conditions. The pertinent provisions of the Agreement to the issues before me involve the Agreement's reserve and free agency systems. Essentially, the free agency system permits players who have completed six major-league playing seasons to set their wages with individual owner clubs. See Basic Agreement, Article XX(B), attached as Ex. D to Pet'r Mem.P. & A.Supp.Pet.Prelim.Inj. The anti-collusion provision of the Basic Agreement, Subsection F of Article XX, provides, in relevant part, that the wage process between the free agent individual player and club owner
is an individual matter to be determined solely by each Player and each Club for his or its own benefit. Players shall not act in concert with other Players and the Clubs shall not act in concert with other Clubs.
*251 The Basic Agreement also limits the number of free agents in two top performance categories that each club may sign. Id. at Article XX(B)(5). Once a player with six years or more seasons of play (hereinafter a "six-plus player") has exercised his right to become a free agent, he must play an additional five years in the Major League before he is again eligible for free agency. Id. at Article XX(D)(1).
With respect to reserve players, i.e., those with less than six years of experience, there is a standard agreement called the Uniform Player's Contract ("UPC"). The UPC, which is incorporated into the Basic Agreement, is a boilerplate contract whose execution essentially requires the parties only to fill in the blanks with information such as the player's name, the club's name, and the dollar amount of salary agreed upon. The Basic Agreement sets the minimum salary for a player's first-year contract. At the end of that first year, an owner may tender a player an additional year's contract in an offer under terms whose parameters are dictated by the Basic Agreement. If the player refuses the offer, the owner is entitled to "reserve" the player's services and the player is not permitted to play for other teams. An owner may only reserve a player once under this system.
All players with more than three but less than six years of play are eligible for salary arbitration.[2] If an owner and player cannot agree to a salary figure, either may insist, without the consent of the other, that the figure be set in salary arbitration. Under this process, the owner and the player sign a UPC and each submits a salary figure to an arbitrator. See Basic Agreement, Article VI(F). The arbitrator then picks one of the two submitted figures using evaluation criteria set forth in the Basic Agreement including comparison with figures for performance comparable free agents. The arbitrator has no authority to pick a number that she or he believes is more equitable than the numbers submitted by the parties. Id. Any salary dispute, regardless of the seniority of the player, may also be submitted to arbitration but only if both parties consent. Id. at VI(F)(1).
Those players with less than six playing seasons and others who have not become free agents remain "reserved" to their individual clubs under the Basic Agreement. Essentially, a reserve player may become a free agent if the club breaches his UPC by, for example, failing to paying him; or if the club does not tender him a contract; or if the club terminates the player for poor performance or failure to remain in good physical condition. See Basic Agreement, Article XX(A)(2). The Basic Agreement sets forth minimum wages and other benefits for the reserved players but permits them and their clubs to mutually agree to compensation above the minimums.
The most recent Basic Agreement expired on December 31, 1993. The Players and Owners collectively began negotiations for a new agreement in March 1994. The 1994 baseball season commenced in April 1994, under the full terms of the expired Agreement, including the entry by individual clubs into free agent contracts and salary arbitrations for eligible reserve players. Thus, collective bargaining over the future relationship of owners and players continued simultaneously with individual clubs and players engaged in their contractual mechanisms of free agency and salary arbitration to set wages.
Despite ongoing negotiations over the terms of a new agreement with an exchange of proposals, on August 12, 1994, the Players commenced a strike. Thereafter, the parties, sometimes at their own initiation and other times with the prodding of mediators, continued to discuss proposals for a successor collective bargaining agreement.
I need not describe the minute details of the various proposals discussed. Sufficient for my purpose here is that the Owners desired a "salary cap" with elimination of the salary arbitration system and a more restricted free agency system. The Players objected to a salary cap but, in order to accommodate the Owners' concern about escalating *252 club payrolls, counterproposed a tax system on high-paying clubs to deter extravagant wage offers. Subsequent proposals between the parties centered on discussions concerning the appropriate tax rates and the payroll thresholds above which clubs would be taxed.
On December 22, 1994 the Players submitted a new tax proposal. That same day, the Owners announced that the figures set forth in the new tax proposal were unacceptable, and declared an impasse without making a counterproposal as requested by the then mediator. The Owners also announced that they would immediately and unilaterally impose a salary cap and eliminate salary arbitration. The Owners made no mention of ending free agency rights or the anti-collusion provision of the Basic Agreement. At no time prior to the Owners' unilateral changes had the Players declared an impasse.
Thereafter, cross-charges of unfair labor practices where filed with the Board by the Players and Owners. Even though the Owners had announced the existence of an impasse, negotiations between the parties continued in January 1995. On February 3, 1995, the Owners advised the Board that they had rescinded their previous unilateral changes to the Basic Agreement and that they would continue to negotiate with the Players. Because of the Owners' advice, the Board, also on February 3, stayed its then proceedings.
On February 6, 1995, however, the Owners, by way of letter, informed the Players that:
[u]ntil such time as the [Owners' and Players' bargaining units] ratify a new collective bargaining agreement or until further notice, individual Major League Clubs shall have no authority to negotiate terms and conditions of employment (or any element thereof) with the [Players' Union] or individual players or certified agents. The [Players' Union] is now on notice that individual Clubs are not authorized to negotiate or execute individual player contracts with bargaining unit players during the pendency of collective bargaining between [the Owners' and Players' bargaining units].
Affidavit of Charles P. O'Connor, sworn to March 29, 1995 ("O'Connor Aff."), at Ex. 2.
Also on February 3, an attorney for the owners advised the Owner Clubs that "individual club/player bargaining" and salary arbitration were permissive topics of collective bargaining and that the anti-collusion provision of the Basic Agreement did not impede the Owners' bargaining representatives from negotiating terms for individual free agent contracts or reserve player salaries.
Discussions between representatives of the Owners and Players continued again despite renewed activity before the Board, its issuance of the Complaint and Notice of Hearing, and the filing of this Petition. In fact this week, the Baseball Commissioner on behalf of the Owners set forth another bargaining proposal. On March 29, 1995, the Players offered to return to work under the full terms of the expired Basic Agreement and have indicated to the Court that they will return to play baseball if an injunction issues restoring the status quo terms of the expired Basic Agreement. Absent an injunction, opening season, with replacement players, was scheduled to start on April 2, 1995.

DISCUSSION
Recognizing that the flow of commerce is "substantially burden[ed]" by the "inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association," Congress in 1935 passed the National Labor Relations Act. NLRA § 1, 29 U.S.C. § 151. In the first section of the Act, Congress expressed its hope that commerce would thrive if the right of employees to "organize and bargain collectively" was legally protected, thereby removing sources of "industrial strife and unrest." Id. The National Labor Relations Board, the governmental body that implements the Act, is empowered "to prevent any person from engaging in any unfair labor practice. ..." NLRA § 10(a), 29 U.S.C. § 160(a). Assisted by Regional Offices, the Board investigates charges of unfair labor *253 practices, and upon a finding of a meritorious charge, may issue a complaint. Complaints are heard by an Administrative Law Judge ("ALJ"), after which the Board reviews the ALJ's findings of fact and recommendations of disposition and conducts its own hearing if it chooses.
Provision 10(j) of the Act authorizes district courts to grant temporary injunctions pending the outcome of unfair labor practice proceedings before the Board. 29 U.S.C. § 160(j). Provision 10(j) reflects Congress's recognition that, absent injunctive relief, the Board's often lengthy administrative proceedings could allow an unfair labor practice to go unchecked and thereby render a final Board order ineffectual. Kaynard v. Palby Lingerie, Inc., 625 F.2d 1047, 1055 (2d Cir. 1980); see also Eisenberg v. Lenape Products, Inc., 781 F.2d 999, 1006 (3d Cir.1986) (Becker, J., dissenting) (average unfair labor practice grievance takes NLRB 15 months to adjudicate) (citing Kobell v. Suburban Lines, 731 F.2d 1076, 1094 n. 32 (3d Cir.1984)).
In the matter before me, the NLRB has charged the Owners with violating §§ 8(a)(1) & (5) of the Act,[3] that is, of violating the duty to bargain collectively in good faith with the Players. The duty to bargain collectively is defined in § 8(d) as the "mutual obligation of the employer and the representative of the employees to ... confer in good faith with respect to wages, hours, and other terms and conditions of employment...." 29 U.S.C. § 158(d).
The potential subject matter of parties engaged in collective bargaining has been divided by the Supreme Court into two categories: mandatory and permissive subjects of bargaining. See N.L.R.B. v. Wooster Div. of Borg Warner Corp., 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958). Mandatory subjects are those encompassed in Section 8(d) in the phrase "wages, hours, and other terms and conditions of employment," while permissive subjects are all other matters. Id. The distinction between mandatory and permissive subjects of bargaining is crucial in labor disputes, because it determines to what extent one party may compel the other to bargain over a given proposal: mandatory subjects require the parties to bargain in good faith, whereas no such requirement adheres to permissive subjects. It is not always obvious whether or not a provision relates to "wages, hours, and other terms and conditions of employment," and the mandatory/permissive distinction is the subject of much caselaw.
The distinction between mandatory and permissive subjects of bargaining is also important upon expiration of a collective bargaining agreement, in the period before the parties have instituted a successor agreement. During the interim between agreements, the Supreme Court has held, the parties must honor the terms and conditions of the expired contract that involve mandatory subjects of bargaining, at least until the parties reach a good faith impasse. N.L.R.B. v. Katz, 369 U.S. 736, 746, 82 S.Ct. 1107, 1113, 8 L.Ed.2d 230 (1962). A unilateral change of an expired provision on a mandatory topic, such as one involving wages, is an unfair labor practice, as it violates the duty to bargain collectively in good faith.[4] The provision of the expired agreement survives only until the parties reach a new agreement or until the parties bargain in good faith to impasse. The policy behind the rule retaining the mandatory terms of the expired agreement is that it will be more effective in promoting peaceful negotiations than a rule allowing a change in the status quo during the critical bargaining period. See, e.g., Laborers Health & Welfare Trust v. Advanced Lightweight Concrete Co., 484 U.S. 539, 544 n. 6, 108 S.Ct. 830, 833 n. 6, 98 L.Ed.2d 936 *254 (1988) ("Freezing the status quo ante after a collective agreement has expired promotes industrial peace by fostering a non-coercive atmosphere that is conducive to serious negotiations on a new contract").
In the matter before me, the Owners do not deny that they changed provisions in the expired contract; specifically, that they revoked the salary arbitration clause and eliminated section XX(F), the free agency anti-collusive provision. The Owners assert, however, that their changes were allowed because the provisions concerned a statutorily permissive topic, i.e., who would collectively bargain for them over free agent and reserve player salaries. The NLRB maintains that the Owners' changes involved mandatory subjects, and the Owners thereby committed an unfair labor practice by undermining the collective bargaining process. The NLRB petitions this court for injunctive relief.
My responsibility in the resolution of the 10(j) petition is to consider: (1) whether there is "reasonable cause to believe" that the respondent has violated the Act and (2) whether temporary injunctive relief is "just and proper." See, e.g., Kaynard v. MMIC, Inc., 734 F.2d 950, 953 (2d Cir.1984). In other words, I must decide whether the NLRB had "reasonable cause to believe" that the unilateral changes made by the Owners were to mandatory provisions,[5] and, if I uphold the Board's determination, I must then consider whether injunctive relief is just and proper. The standards for reasonable cause to believe and just and proper are as follows.

The Standard for Reasonable Cause
In reviewing a reasonable cause determination by the Board, a district court must give "appropriate deference" to the specialized knowledge of the Board. Silverman v. 40-41 Realty Assocs., Inc., 668 F.2d 678, 681 (2d Cir.1982) (citations omitted). Thus, the district court should give the Regional Director's version of the facts "the benefit of the doubt." Seeler v. The Trading Port, Inc., 517 F.2d 33, 37 (2d Cir.1975) (citation omitted). Indeed, the Board's view of the facts should be sustained "unless the court is convinced that it is wrong." Palby, 625 F.2d at 1051 (citing Danielson v. Int'l Organization of Masters, Mates & Pilots, 521 F.2d 747, 751 (2d Cir.1975)); see also Kaynard v. Mego Corp., 633 F.2d 1026, 1031 (2d Cir.1980) (reasonable inferences drawn in favor of charging party).
The Second Circuit has further recognized the expertise of the Board by holding that even on issues of law, district courts should be "hospitable" to the views of the Board. Mego Corp., 633 F.2d at 1031 (citations omitted). Moreover, determining what are mandatory topics of bargaining is "at the heart of the Board's functions." Toledo Typographical Union v. N.L.R.B., 907 F.2d 1220, 1222 (D.C.Cir.1990); see also Olivetti Office U.S.A., Inc. v. N.L.R.B., 926 F.2d 181, 185-86 (2d Cir.), cert. denied, 502 U.S. 856, 112 S.Ct. 168, 116 L.Ed.2d 132 (1991) (NLRB determination that bargaining issue is a mandatory term and condition under § 8(d) entitled to deference because of Board's expertise).
An NLRB legal determination that a violation of § 8(d) has occurred should be upheld unless the Board (1) reached its position by either failing to apply the correct legal standard or by misconstruing the plain language of the correct standard; (2) made a determination so fundamentally inconsistent with the structure of the NLRA that its decision can be viewed as an attempt to usurp major policy decisions by Congress; or (3) is attempting to move into an area of regulation which Congress has not committed to it. Ford Motor Co. v. NLRB, 441 U.S. 488, 497-98, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979) (citations and quotations omitted).

The Standard for Just and Proper Relief
Upon a finding of reasonable cause, a court determines whether the relief requested by the Board is "just and proper." Mego Corp., 633 F.2d at 1030 (citations omitted). *255 The decision to issue an injunction under § 10(j) lies within the sound discretion of the district court. Silverman v. Imperia Foods, Inc., 646 F.Supp. 393, 398 (S.D.N.Y. 1986) (Sweet, J.) (citations omitted). The decision to exercise this discretion is guided by "general rules of equity." 40-41 Realty Assoc., 668 F.2d at 680. Because an injunction is an extraordinary remedy, the Second Circuit adheres to a stringent "irreparable injury" requirement when considering § 10(j) petitions. Compare Mego Corp., 633 F.2d at 1034 n. 10 (rejecting suggestion that in 10(j) cases, a lower standard for injunctive relief applies) with Pascarell v. Gitano Group, Inc., 730 F.Supp. 616, 620 (D.N.J.1990) (no showing of irreparable injury or likelihood of success on merits required under 10(j)).
The Second Circuit has specifically found injunctive relief "just and proper" to (1) prevent irreparable injury to the party injured by the unfair labor practice, Palby, 625 F.2d at 1053; (2) restore or preserve the status quo that existed prior to the violation, Mego Corp., 633 F.2d at 1033; (3) protect the Board's ability to issue a final remedy, Morio v. North American Soccer League, 632 F.2d 217, 218 (2d Cir.1980) (per curiam) (citations omitted); Palby, 625 F.2d at 1055 (same); or (4) protect the public interest in the collective bargaining process, Seeler, 517 F.2d at 40 (citations omitted)[6].
Applying these standards to the factual and legal arguments before me, I find as follows:

The Board has Reasonable Cause to Believe the Owners have Engaged in an Unfair Labor Practice
As noted, there is no dispute that on February 6, 1995, the Owners unilaterally changed certain provisions of the expired Basic Agreement; namely, they announced that the PRC, rather than the individual clubs, would negotiate individual players' free agency contracts, and that the salary arbitration rights of eligible reserve players were eliminated. My inquiry of whether the Board had reasonable cause to believe that the Owners committed an unfair labor practice hinges on whether I find reasonable cause for the Board's legal finding that the provisions at issue involved mandatory subjects of bargaining. If so, and if such relief is "just and proper," I must grant the injunction.
Collective bargaining in the context of professional sports presents issues different from most other contexts. On the one hand, the talent of an individual athlete can provide him with extraordinary bargaining power, but on the other hand, a player may sell his talent only to a circumscribed group of owners, who have something akin to monopoly power in the sport at issue. These circumstances in professional sports have given rise to the development of the reserve/free agency system, which, perhaps not surprisingly, is quite different from other models of collective *256 bargaining in less specialized and unique industries.
To look for guidance, then, in deciding whether the Board had reasonable cause for making its determination that the provisions changed by the Owners were mandatory, I find most helpful precedent that involves professional sports. Accord, Wood v. Nat'l Basketball Ass'n, 809 F.2d 954, 961 (2d Cir.1987) (collective bargaining between athletes and their leagues "raise[s] numerous problems with little or no precedent in standard industrial relations"). And in the sports context, courts have overwhelmingly held that the constituent parts of reserve/free agency systems are mandatory, not permissive, subjects of bargaining.
For example, this Circuit held in Wood that the agreement between professional basketball players and team owners "is a unique bundle of compromises," and matters such as salary caps, minimum individual salaries, fringe benefits, minimum aggregate team salaries, guaranteed revenue sharing, and first refusal provisions are all mandatory subjects of bargaining, as "[e]ach of them is intimately related to `wages, hours, and other terms and conditions of employment.'" Id. at 961-62. Likewise, in Mackey v. Nat'l Football League, 543 F.2d 606, 615 (8th Cir.1976), cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977), the Eighth Circuit held that the Rozelle Rule,[7] even though it does not on its face deal with wages, hours, and other terms and conditions of employment, is a mandatory subject of bargaining because it "operates to restrict a player's ability to move from one team to another and depresses player salaries." See also, Powell v. Nat'l Football League, 930 F.2d 1293, 1298-99 (8th Cir.1989) (agreements establishing first refusal and compensation system are mandatory subjects).
I recognize that these precedents, which address the question of whether wage topics trump the antitrust laws, do not deal with the issue before me, i.e., the continuation of reserve and free agency systems in which individual owners competitively bid for players after the expiration of a collective bargaining agreement and pending the completion by Player and Owner representatives of negotiations over a successor agreement. The owners argue that the right to bid competitively or collectively must be a permissive topic of bargaining, because if it were a mandatory topic, the Owners would be forced to give up their statutory right to bargain collectively.
Courts in addressing the antitrust area of law have easily recognized, however, that the essence of collective bargaining in professional sports is the establishment and maintenance of reserve and free agency systems in which owners agree to bid competitively for some players and collectively for others. The Owners' argument has a superficial appeal in its attempt to harken back to the unionizing cry of employees when they banded together to create this nation's labor laws. What the Owners have missed here, and the NLRB has not, is that the statutory right to join collective bargaining units belongs to employees, not to employers. The NLRA gives only employees the section 7 right to bargain collectively through an elected representative. The only reciprocal statutory right the Act imposes on employers and employees is that they bargain with the other in good faith. In other words, the term "employer union" for collective bargaining purposes is not meaningful.
The extent of statutory protection for an employer is that it may select a representative for the purpose of bargaining free of coercion from a labor union. See NLRA § 8(b)(1)(B); 29 U.S.C. § 158. This right is not a statutory right for a group of employers to bargain collectively through one representative. In fact, while many multi-employer bargaining units, like the PRC, have been formed, the NLRB and the union must consent to the such formation. See, e.g., NLRB v. Johnson Sheet Metal, Inc., 442 F.2d 1056, 1059 (10th Cir.1971) ("[t]he basic test of the appropriateness of a multi-employer bargaining unit is whether it was created with the approval, express or implied, of the parties").
*257 The Owners' attempt to create reciprocal statutory rights to collective bargaining between Unions and Employer groups is simply a wrong presumption from which to start. Hence, any reliance on cases that address prohibitions upon a Union's waiver of its statutory rights to bargain collectively is misguided, as they have no application to an employer's rights or obligations to continue a joint or individual employer bargaining system that has, through arms-length, good faith bargaining, been put into place. As expressed in the Reply Brief of the NLRB, the "valid interest in the selection of [the Owners'] own bargaining representatives ... does not trump employees' Section 7 right to have the status quo ante maintained on mandatory bargaining subjects during negotiations." Reply Mem. at 14. An interest is not a statutory right. It can be waived as the Owners have done here in the Basic Agreement.
Maintaining the reserve/free agency systems in the interim between collective bargaining agreements does not alter the rights of Owners to have the PRC represent them for purposes of negotiating a successor agreement or to continue to oppose the inclusion of the systems in any successor agreement. The Owners can, if they successfully bargain, end the free agency and salary arbitration systems, exclude the anti-collusion provision, and create an entirely new system. What they cannot do is alter particular individual's wages until the system is changed by agreement or until the parties negotiate to impasse. That is the nub of all wage negotiations which are inherently mandatory subjects of bargaining. It must be remembered that many employers are forced to continue sometimes onerous and debilitating wage obligations until the collective bargaining process runs its course, just as many employees may earn less than they would in a system that more closely duplicates the free market. Having freely entered into the free agency and reserve systems in their Basic Agreement, the Owners are bound to that system until they bargain in good faith to an impasse.
In view of the abundant caselaw in the professional sports context that has found that constituent parts of the reserve/free agency system are mandatory subjects of collective bargaining, I find that the Board had substantial reasonable cause to conclude, and a substantial likelihood of success ultimately in establishing, that the unilateral changes made by the Owners to the free agency system before impasse violated the rule against changes to mandatory subjects of bargaining. In summary, the Board has clearly met its injunctive remedy standard in demonstrating that the Owners committed an unfair labor practice by their unilateral abrogation of Article XX(F) and the free agency system.
For substantially similar reasons, I find that salary arbitration for reserve players is also a mandatory part of the collective bargaining process between the Players and the Owners. The Owners argue that their salary arbitration system is indistinguishable from interest arbitration clauses, which are generally classified as permissive subjects of bargaining. Thus, the Owners contend, they have no statutory obligation to preserve salary arbitration until the formation of a new collective bargaining agreement.[8]
*258 The Second Circuit has recognized two basic types of arbitration in the labor context: interest arbitration and rights arbitration. New York Typographical Union No. 6 v. Printers League Section of the Assoc. of the Graphic Arts, 919 F.2d 3, 3 n. 2 (2d Cir.1990). Interest arbitration "concerns disputes over terms of new or renewal contracts." Id.; see also Local 58, Int'l Brotherhood of Electrical Workers v. Southeastern Michigan Chapter, Nat'l Electrical Contractors Ass'n, Inc., 43 F.3d 1026, 1030 (6th Cir.1995) (interest arbitrator acts as legislator in fashioning new contractual obligations, rather than as judicial officer who concentrates on construing terms of existing agreement). Rights arbitration, in contrast, is for disputes "over the interpretation or application of a contract." Printers League, 919 F.2d at 3 n. 2. Because interest arbitration clauses involve "a mechanism for resolving disputes which may arise as to the terms of future contracts," as opposed to existing terms and conditions of employment, they are a non-mandatory topic of bargaining. Sheet Metal Workers Local Union No. 20 and George Koch Sons, Inc., 306 NLRB 834, 1992 WL 64220 at *9 (March 25, 1992).
I agree with the Board's conclusion that the salary arbitration clause at issue here is not a traditional interest arbitration clause. The distinction blurred by the Owners' argument is that new future contractual obligations are not being created by the salary arbitrator. By the time a player and owner go to salary arbitration, a UPC, created by the terms of the Basic Agreement, has already been entered into by the parties. The only item missing from the executed contract is a dollar amount. The owners cannot escape the plain and unambiguous language of Article VI(F)(6), which provides:
Form of submission: The Player and the Club shall each submit to the arbitrator and exchange with each other in advance of the hearing single salary figures for the coming season (which need not be figures offered during the prior negotiations). At the hearing, the Player and the Club shall deliver to the arbitrator a Uniform Player's Contract executed in duplicate, complete except for the salary figure to be inserted in paragraph 2. Upon submission of the salary issue to arbitration by either Player or Club, the Player shall be regarded as a signed Player....
Basic Agreement, Article VI(F)(g) (emphasis added); see also id. at Article VI(F)(5) (within 24 hours of hearing arbitrator shall insert salary figure awarded in the duplicate UPC's delivered to him or her). Before the arbitrator rules, there is no question that the player will provide his services to the club for a specified period of time and that the club will pay for those services. The arbitrator's only task is, literally, to fill in the blank where the salary figure goes.
Even if the salary arbitration clause contained in the Basic Agreement is an interest arbitration clause, however, I also agree with the Board's reasoning in Sea Bay Manor Home for Adults, 253 NLRB 739, 1980 WL 12643 (December 15, 1980) and Columbia Univ. in the City of New York, 298 NLRB 941, 1990 WL 122487 at *1 (June 28, 1990) that interest arbitration clauses can survive the expiration of collective bargaining agreements where the clauses:
[are] so intertwined with and inseparable from the mandatory terms and conditions for the contract currently being negotiated as to take on the characteristics of the mandatory subjects themselves.
Sea Bay at *3; see also Columbia Univ. at *1 (interest arbitration clause mandatory where it has immediate effect on wages and terms of employment).
The essence of the reasoning in Sea Bay and Columbia Univ. is that in some industries the result of collective bargaining is not to stop talking in the future about a dispute but a recognition that the best continuing process for the parties to establish wages is in arbitration. In these situations, a salary arbitration is a current term of employment. That is the situation in baseball. Salary arbitration is the collectively bargained *259 wage in the parties' Agreement, and the Board's view of it as such is not clearly or otherwise erroneous. For the foregoing reasons, the Board has sustained its burden of proving that the Owners committed unfair labor practices both by eliminating Article XX(F) of the free agency system and the salary arbitration provisions of the Basic Agreement.

There is Just and Proper Cause to Issue an Injunction.
I find injunctive relief here warranted for several reasons. An important public interest in the process of collective bargaining will be irreparably harmed if an injunction does not issue. This strike has captivated the public's attention, given the popularity of the sport as well as the protracted nature and well-documented bitterness of the strike. Thus, this strike is about more than just whether the Players and Owners will resolve their differences. It is also about how the principles embodied by federal labor law operate. In a very real and immediate way, this strike has placed the entire concept of collective bargaining on trial. It is critical, therefore, that the Board ensure that the spirit and letter of federal labor law be scrupulously followed. If the Board is unable to enforce the NLRA, public confidence in the collective bargaining process will be permanently and severely undermined. See Seeler, 517 F.2d at 40 ("the standards of the public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief in these cases.") (quotation omitted); DeProspero v. House of Good Samaritan, 474 F.Supp. 552, 557 (N.D.N.Y.1978) ("courts are required to formulate equitable decrees which will further the public interest in maintaining respect for the law, encouraging the resolution of industrial disputes through collective bargaining") (citation omitted). Issuing the injunction before Opening Day is important to ensure that the symbolic value of that day is not tainted by an unfair labor practice and the NLRB's inability to take effective steps against its perpetuation.
Although this public interest alone justifies the issuance of an injunction, I also find that returning the parties to the status quo will permit them to salvage some of the important bargaining equality that existed before the February 6 unfair labor practices were committed. Before February 6, the Players had the right to attempt to salvage the upcoming season and avoid the continuing damage to their short professional careers by offering to return to work under the terms of the Basic Agreement before replacement players were used in the regular season. Even though Opening Day may need to be delayed, the parties still have time to avoid unduly abbreviating the season and to salvage it. Without an injunction, that bargaining possibility and its benefit in fostering good-faith continuing negotiations for the Players, which existed on February 6, would be greatly diminished if not lost.
Finally, the Owners argue that even if there is reasonable cause to believe that they committed unfair labor practices, the resulting injury to the Players is merely lost wages which can be compensated through damages.[9] The Owners' argument is flawed because there is more than money involved in the systems at issue here and because there is no adequate way to reconstruct the systems to fully recompense the losses of free agents or reserve players.
Salary is just one factor a free agent considers when seeking and accepting offers. A free agent may wish to join a team because of personal reasons such as family considerations, or because of promises of more playing time. Likewise, a free agent may select a team that pays less money but whose coaching staff and team roster make it a World Series contender. See Transcript of *260 Oral Argument, dated March 31, 1995 ("Tr."), at 22-23.
The importance of non-monetary considerations is recognized in the Basic Agreement which provides that during the notice period of free agency election, individual players will not enter into new contracts but may discuss the following subjects with other teams:
 the Player's interest in playing for the Club, and the Club's interest in having the Player play for it;
 the Club's plans about how it intends to utilize the Player's services (as a starting pitcher or reliever, as a designated hitter or not, platooning, etc.);
 the advantages and disadvantages of playing for the Club including the nature of the organization, the climate of the city, availability of suitable housing, etc.;
 length of contract
 guarantee provisions
 no trade or limited no-trade provisions.
Basic Agreement, Art. XX(B)(2)(b).
The protections of the NLRA extend to non-monetary bargaining topics that are "terms and conditions of employment." See 29 U.S.C. § 158(d); see also Ford Motor Co., 441 U.S. at 497-98, 99 S.Ct. at 1849 (deference given to NLRB judgment that an unfair labor practice had been committed by employer's unilateral change in cafeteria services and vending machine access because "the availability of food during working hours and the conditions under which it is to be consumed are matters of deep concern to workers, and one need not strain to consider them to be among those `conditions' of employment that should be subject to the mutual duty to bargain."); Connecticut Light & Power Co. v. N.L.R.B., 476 F.2d 1079, 1081 (2d Cir.1973) (non-wage benefits such as selection of health insurance carrier are mandatory subjects of bargaining under 8(d)). In professional baseball, whether to leave a team, where to go and why are of "deep concern" to the affected players and the loss of those choices in the terms and conditions of employment cannot be adequately recompensed by money. The only adequate remedy to protect these important personal rights, rights which the NLRB is empowered to protect, is to issue an injunction and thereby restore the status quo. Otherwise, the harm to the Players is the very one the Owners' unfair labor practices sought to achieve, i.e., an alteration of free agency rights and a skewing of their worth.
Similarly, to the extent the salary arbitration system is intimately intertwined with the choice for both owners and players between free agency or arbitration, it is nearly impossible to reconstruct retrospectively the factors that would have influenced each side's decision at the time of election. Hence, even though it is easier later to reconstruct the actual process of salary arbitration and more precisely determine a lost wage from that process, monetary damages are insufficient to recompense for the harm caused in eliminating the salary arbitration process as a choice in the integrated reserve/free agency systems.
Free agency, salary arbitration, and the reserve systems are three aspects of the professional baseball wage structure which are inexorably linked. See, e.g., Basic Agreement, Article XXIII, at 61-62 (Owners and Players had right to reopen Basic Agreement solely with respect to Article VI(B) (minimum salary), Article VI(F) (salary arbitration), and Article XX) (reserve system)). There is clear evidence on the record demonstrating that any economic injury suffered by free agents, for example, directly impacts upon all players. From 1985-87, the Owners engaged in allegedly collusive activities. Under the grievance procedures set forth in the Basic Agreement, an arbitration was had. See, e.g., In the Matter of the Arbitration between Major League Baseball Players Ass'n. and The 26 Major League Clubs, Grievance 88-1, attached as an unmarked exhibit to Pet.Reply Mem. Although the grievance was ultimately settled, the arbitrators found that "depressing free agent salaries led directly to lower salaries for the salary arbitration players." Affidavit of Donald Fehr, sworn to March 30, 1995 ("Fehr Aff."), at ¶ 16; see also id. at ¶ 23 (under baseball wage structure, there is a correlation between players' salaries and seniority); tr. at 28-29.
*261 Thus, a poisoning of the free agency bargaining process will also affect the wage negotiations of reserve and salary arbitration players. Conversely, the loss of salary arbitration in the reserve system skews the choice of free agency rights. The unusual wage structure in this monopoly industry makes it extraordinarily difficult if not nearly impossible to reconstruct past market conditions for purposes of retroactive damage calculations. Where "monetary damages are difficult to ascertain or are inadequate," an injunction is appropriate. Danielson v. Local 275, Laborers Int'l Union of North America, 479 F.2d 1033, 1037 (2d Cir.1973) (citations omitted); see also Gerard v. Almouli, 746 F.2d 936, 939 (2d Cir.1984) (upholding grant of preliminary injunction where damages impossible to ascertain). In short, in balancing the equities, I find that the harm to the public, the players, and the NLRB compels the issuance of a Section 10(j) injunction in this case.

CONCLUSION
For the reasons discussed, the Court has issued an injunction directing and ordering Respondents, the Major League Baseball Player Relations Committee, Inc. and its twenty-eight constituent member clubs of Major League Baseball, 1) to restore the terms and conditions of employment provided under the expired Basic Agreement which was effective January 1, 1990, including its free agency/reserve systems with salary arbitration for eligible reserve players, Article XX(F) and all other of their constituent parts; 2) immediately to rescind by written notice to all club members any actions taken, including the February 6 letter from Charles P. O'Connor to Donald M. Fehr, Re: Exclusive Representative Status of PRC and the February 6, 1995 Memorandum with its attached Questions and Answers sent by Charles P. O'Conner to All Major League Clubs Subject: Individual Club/Player Contract Negotiations, that are inconsistent with or conflict with the terms and conditions of employment, including all provisions of the free agency/reserve systems provided under the expired Basic Agreement; and 3) to bargain in good faith without unilateral changes to the Basic Agreement with the Major League Baseball Players Association in compliance with § 8(a)(1) and (5) of the National Labor Relations Act.
This injunction is to remain in effect until either (1) the Players and Owners enter into a new collective bargaining agreement that replaces the expired Basic Agreement, or (2) the final disposition of the matters pending before the National Labor Relations Board on the Complaint and Notice of Hearing of the General Counsel of the Board in Case No. 2-CA-28177, or (3) a finding of this court, upon petition of the Players or Respondents for a dissolution of the injunction demonstrating that an impasse in good faith bargaining has occurred despite a reasonable passage of time negotiating in good faith the full mandatory bargaining terms of the expired Basic Agreement.
SO ORDERED.
NOTES
[1] At the hearing held on this matter on March 31, 1995, I rendered an Opinion issuing an injunction in this case based on the skeletal outline of my reasoning contained in the transcript of the hearing. This Amended Opinion represents a more detailed version of my original Opinion which I had indicated to the parties would be forthcoming.
[2] Players with between two and three years of play are eligible for salary arbitration if, in comparison to other two to three year players, they rank in the top 17% in terms of total number of days played. See Basic Agreement, Article VI(F)(1).
[3] Section 8(a) provides:

It shall be an unfair labor practice for an employer 
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 7 enumerates "Rights of Employees"]; ...
(5) to refuse to bargain collectively with the representatives of his employees....
[4] I note that striking is not a violation of the collective bargaining process; parties may legitimately exert pressure through the use of such economic weapons. See, e.g., Brown v. Pro Football, Inc., 50 F.3d 1041, 1051 (D.C.Cir.1995).
[5] In their papers, the Owners seemed to argue that they had bargained to impasse and that therefore, they were allowed to unilaterally change even mandatory terms. The Owners abandoned that position at Oral Argument, and admitted that an impasse had not been reached. I therefore need not address the NLRB's finding that the parties had not reached impasse.
[6] The Second Circuit has classified injunctions as mandatory or prohibitory. A mandatory injunction requires a party to take certain affirmative steps, while a prohibitory injunction requires a party to desist from doing certain acts in order to preserve the status quo. See Abdul Wali v. Coughlin, 754 F.2d 1015, 1025-26 (2d Cir.1985). The general standard for an injunction, requires that the moving party prove irreparable harm and either 1) a likelihood of success on the merits or 2) substantial question going to the merits as to make them a fair ground for litigation, together with a balance of hardships tipping decidedly toward the movant. For a mandatory injunction, the Second Circuit has articulated a higher standard that requires a moving party to make a clear showing of entitlement to relief and "extreme or very serious damage" from a denial of an injunction. Id.

The Supreme Court, however, has recently cast doubt upon the distinction between mandatory and prohibitive injunctions in labor situations:
[I]n borderline cases injunctive provisions containing essentially the same command can be phrased either in mandatory or prohibitory terms. Under a literal application of petitioners' theory, an injunction ordering the union: "Do not strike," would appear to be prohibitory and criminal, while an injunction ordering the union: "Continue working," would be mandatory and civil.
Int'l Union, United Mine Workers of America v. Bagwell, ___ U.S. ___, ___, 114 S.Ct. 2552, 2561, 129 L.Ed.2d 642 (1994) (citations omitted). For purposes of the instant petition, it does not matter whether the distinction between mandatory and prohibitive injunctions remains valid in labor disputes because I find that the Board's request meets the standards for both types of injunctions.
[7] The Rozelle Rule requires inter-team compensation when a player's contractual obligation to one team expires and he is signed by another.
[8] In their papers, the Owners argue I should defer to the resolution of a grievance arbitration filed by the Players, which seeks a binding contract interpretation that would make all salary arbitration eligible players into free agents. See Owners' Mem. at 32. At oral argument, counsel for the Owners did not discuss this argument. The Court can see why. The Owners rely upon a line of cases based on the reasoning set forth in Collyer Insulated Wire, 192 NLRB 837 (1971). However, almost without exception, cases following Collyer have involved the NLRB deferring to grievance arbitration, rather than a district court deferring to arbitration when a Section 10(j) injunction is being sought. Moreover, deferral under Collyer is appropriate only where the parties have had "a long and productive' relationship and no claim was made of enmity by the employer to the employees' exercise of protected rights." Baron Bros. Auto Group, Inc., 316 NLRB No. 103, 1995 WL 89300 at *18 (February 28, 1995) (quotation omitted). Deferral is inappropriate where there exists "a long list of actions which constitute attempts to coerce and restrain employees in the exercise of their Section 7 rights and which constitute attempts to undermine the position of [the] Local...." Id. Virtually the only issue the parties here do agree upon is that the relationship between the Players and the Owners has long been filled with animosity. The Owners, moreover, have failed to make any showing that deferral would likely resolve the unfair labor practices underlying the NLRB's petition.
[9] The Owners also suggest that even if the free agency bargaining process has been tainted by the commission of unfair labor practices, an injunction is inappropriate because most players are not free agents. This argument is specious. First, as of February 10, 1995, twenty percent of all players had enough seniority to opt for free agency status. See Transcript of Oral Argument, dated March 31, 1995, at 23. This is a sizable portion of the Players' union, and it defies common sense as well as general principles of equity to deny them relief simply because they do not constitute a majority of all players.